IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MONTE GOODE, | ) | CASE NO.  1:20-CV-02240-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| SOCIAL SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OF OPINION AND** |
| Defendant. | ) | **ORDER** |
| | ) | |
| | ) | |

Plaintiff, Monte Goode ("Plaintiff" or "Goode"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED**.**

## I.    PROCEDURAL HISTORY

In November 2018, Goode filed an application for SSI**,** alleging a disability onset date of March 13, 2018 and claiming he was disabled due to: back injury; lower back strain; neural pains in neck; numbness in his fingers and arms; no strength in his hands and grip; arthritis; depression; poor breathing; trouble finding oxygen; foot problems; an inability to stand or walk for long periods of time; and migraines.  (Transcript ("Tr.") at 22, 140.)  The application was denied initially and upon reconsideration, and Goode requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 22.)

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

1

On December 11, 2019, an ALJ held a hearing, during which Goode, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On January 14, 2020, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 22-36.)  The ALJ's decision became final on August 6, 2020, when the Appeals Council declined further review.  (*Id.* at 1-7.)

On October 5, 2020, Goode filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 17-18.)  Goode asserts the following assignment of error:

> (1) Whether the ALJ's decision is supported by substantial evidence when the ALJ failed to adequately evaluate the limitations resulting from Mr. Goode's severe impairments.

(Doc. No. 17.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Goode was born in November 1968 and was 51 years-old at the time of his administrative hearing (Tr. 22, 34), making him a "person closely approaching advanced age" under Social Security regulations. *See* 20 C.F.R. § 416.963(d).  He has at least a high school education and is able to communicate in English.  (Tr. 34.)  He has past relevant work as a cleaner and laborer for building maintenance.  (*Id.*)

### B.    Relevant Medical Evidence[2]

On February 5, 2016, Goode saw Maria Antonelli, M.D., for complaints of back and joint pain. (*Id.* at 326.)  Goode reported back pain for the past five years that was worse with movement and better with lying down.  (*Id.*)  Goode denied any weakness or numbness in his lower extremities, as well as joint swelling, redness, or tenderness.  (*Id.*)  Goode also complained of joint pains in his elbows, knees, and hands, and reported his fingers "lock up" and he was unable to hold anything with his hands.  (*Id.*)  Goode

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  Further, since Goode only challenges the ALJ's physical findings, the Court's discussion of the relevant evidence is further limited to Goode's physical impairments.

also told Dr. Antonelli he had numbness in the fourth and fifth digits of his left hand.  (*Id.*)  On examination, Dr. Antonelli found no edema, normal muscle tone and bulk, normal gait, full range of motion of the back, paraspinal tenderness bilaterally, negative straight leg raise test, some left back pain on FABER, bilateral crepitus of the elbows but full range of motion and no swelling, effusion, or warmth, and full range of motion of the wrists with no swelling or warmth.  (*Id.* at 327.)  Dr. Antonelli reviewed imaging of the left elbow from 2014, which showed degenerative arthritic changes, as well as a 2014 EMG which revealed "evidence of bilateral ulnar neuropathy at or about the elbow with segmental demyelination with no axonal loss or active signs of denervation."  (*Id.*)  Imaging of the lumbar spine from 2015 showed "mild inferior marginal spurring at multiple levels," as well as "mild disc space narrowing at the L5-S1 level."  (*Id.* at 328.)  Dr. Antonelli ordered elbow braces to help with Goode's elbow pain and ulnar neuropathy and recommended physical therapy for stretches and strengthening.  (*Id.*)  Dr. Antonelli also prescribed Robaxin for use at night.  (*Id.*)

On April 11, 2017, Goode saw Venkata Angirekula, M.D., for follow up regarding his COPD and asthma.  (*Id.* at 287.)  Dr. Angirekula noted Goode's last visit was in October 2016.  (*Id.*)  Goode reported his shortness of breath had improved, although he had good days and bad days.  (*Id.*)  Dr. Angirekula noted Goode worked on car repairs and brake pads and had worked with chemicals, although he wore masks when working.  (*Id.*)  Goode reported no hospitalizations or prednisone use since his last appointment.  (*Id.*)  On examination, Dr. Angirekula found no edema, adequate intensity of breath sounds in both lung fields, mild scattered wheezing, and no clubbing.  (*Id.* at 289.)  An October 2016 CT scan showed a 4 mm nodule dating back to 2014 that was stable and consistent with a benign nodule, as well as "[f]urther significant improvement in appearance of irregular linear/reticular opacities of the left lower lobe consistent with mild residual scarring in the prior site of necrotizing pneumonia."  (*Id.* at 290.)  A July 2016 spirometry test showed a decreased FEV1/FVC ration, FEV1 at 35-49% predicted, and "significant improvement" in FEV1 and FVC with bronchodilator therapy.  (*Id.*)  The treatment notes reflect that the pulmonary function tests were "consistent with a severe obstructive ventilatory defect with a significant response to inhaled bronchodilators, with air trapping and normal diffusing capacity."  (*Id.* at 291.)

On November 20, 2018, Goode saw Nygi Raju, M.D., for a physical.  (*Id.* at 359.)  Goode reported his shortness of breath was getting worse, his asthma was not under control, and he had been out of inhalers for a while.  (*Id.* at 360.)  Goode also complained of numbness in his right little finger for the past six months and occasional pain in his right foot.  (*Id.*)  On examination, Dr. Raju found good breath sounds, no wheezes, rales, or rhonchi, and normal extremities.  (*Id.* at 361.)

On December 4, 2018, Goode underwent another spirometry study.  (*Id.* at 411-12.)  His FEV1/FVC ration was decreased and his FEV1 was 46% predicted.  (*Id.* at 412.)  Goode demonstrated "significant improvement in FEV1 . . . and normalization of FVC . . . with bronchodilator therapy." (*Id.*) Goode's pulmonary function test results were "consistent with a severe obstructive ventilatory defect with a significant response to inhaled bronchodilators, with air trapping and normal diffusing capacity."  (*Id.*)

A December 10, 2018 chest CT of Goode's chest revealed a decrease in the size of the nodule in the right lung, as well as residual scarring and bronchiectasis in the left lower lobe.  (*Id.* at 414-15.)

On January 7, 2019, Goode saw Dorothy Bradford, M.D., for a consultative physical examination. (*Id.* at 381-88.)  Goode reported constant lower back pain and intermittent pain in his big toe.  (*Id.* at 386.) An x-ray of Goode's lumbar spine revealed mild end plate sclerosis and anterior osteophyte formation throughout the lumbar spine, with no evidence of spondylosis or spondylolisthesis.  (*Id.* at 385.)  The overall impression from the x-ray was minimal arthritis with normal alignment.  (*Id.*)  On examination, Dr. Bradford found no wheezes, rales, or rhonchi, normal strength in all muscle groups, normal range of motion of all joints, no edema, flat feet, and bunions on the great toes.  (*Id.* at 387.)  Dr. Bradford opined Goode had mild degenerative joint disease of the lumbar spine, flat feet, and bunions. (*Id.*)  She determined there were no activity restrictions.  (*Id.*)

On January 15, 2019, Goode saw Sean McMillin, DPM, for follow up regarding his intermittent left ankle pain and bunion pain.  (*Id.* at 404.)  Goode reported the pain could last from 30 minutes to all day.  (*Id.*)  While at Goode's last visit Dr. McMillin had ordered custom orthotics, Goode never got them. (*Id.*)  Goode also complained of intermittent, short-lived burning in his second toe.  (*Id.*)  On examination, Dr. McMillin found 5/5 muscle strength with pain on resistance to muscle strength testing, flexible pronated foot, left worse than right, no pain along the PT tendons bilaterally, pain at the lateral gutter and

4

sinus tarsi, left anterior ankle pain, mild pain with ankle range of motion on the left with dorsiflexion, mild left STJ pain or crepitus, moderate to severe size bunions bilaterally that were not reducible and were pain free, and no pain with first MPJ range of motion or central grind test at the first MPJ bilaterally.  (*Id.* at 406.)  Dr. McMillin diagnosed Goode with neuroma vs. neuritis of the second toe, pes planus with secondary sinus tarsitis, left greater than right, left ankle pain, bilateral bunions, and pain in limb bilaterally.  (*Id.*)  Dr. McMillin reiterated Goode's conservative options, and also discussed his surgical options.  (*Id.*)

On January 23, 2019, Goode saw Michael Faust, Ph.D., for a consultative psychological examination.  (*Id.* at 389-95.)  Goode reported he was performing odd jobs such as cutting grass or shoveling snow five days per week for an hour or so.  (*Id.* at 391.)  Goode went grocery shopping independently and he ventured out of his neighborhood approximately weekly.  (*Id.*)  Goode could do household chores or cooking until he got tired or started experiencing joint pain.  (*Id.* at 394.)  Dr. Faust opined that the odd jobs that Goode reported doing five days a week did not appear to be consistent work because Goode said he did them for "'whoever and whenever.'"  (*Id.* at 393.)  Dr. Faust noted Goode walked with a cane and showed signs of pain with movement.  (*Id.* at 392.)

On March 14, 2019, Goode underwent muscle strength testing as part of physical therapy.  (*Id.* at 448.)  Eric Shadrach, PT, noted Goode put forth "[q]uestionable effort" during testing, but even then, Goode's strength ranged from 4-/5 to 5/5.  (*Id.* at 448-49.)

On April 16, 2019, Goode saw Dr. Raju for follow up.  (*Id.* at 442.)  Goode complained of continued numbness of his right ring and little finger and reported he had an EMG scheduled for the following month.  (*Id.*)  Dr. Raju also noted Goode was there for the completion of disability paperwork. (*Id.*)

That same day, Dr. Raju completed a Medical Source Statement.  (*Id.* at 425-27.)  Dr. Raju noted he had seen Goode every one to two months since 2018.  (*Id.* at 425.)  Goode's diagnoses included arthritis in multiple joints, Type 2 diabetes mellitus, COPD, depression, bunions of the feet, and arthritis in

the spine.  (*Id.*)  Dr. Raju listed Goode's prognosis as good and noted no swelling was seen on examination that day.  (*Id.*)  Dr. Raju opined that Goode would have good days and bad days, and he would be absent more than four days a month.  (*Id.*)  Goode could walk one block without rest and could sit for 30 minutes before needing to get up.  (*Id.* at 425-26.)  Goode could stand for 20 minutes before needing to sit down or walk around.  (*Id.* at 426.)  Dr. Raju opined Goode could sit, stand, and/or walk for less than two hours in an eight-hour workday.  (*Id.*)  Goode would need to alternate positions at will and he would require unscheduled breaks.  (*Id.*)  Dr. Raju opined Goode could occasionally lift and carry 10 pounds, twist, stoop, and climb stairs.  (*Id.*)  Goode could never crouch/squat or climb ladders.  (*Id.*)  Dr. Raju further opined Goode had significant limitations with reaching, handling, or fingering; he could grasp, turn, or twist objects 50% of the time bilaterally, perform fine manipulation 25% of the time bilaterally, and reach in front and overhead 75% of the time bilaterally.  (*Id.* at 427.)  Dr. Raju also opined Goode would have difficulty with an eight-hour, five day a week schedule because it involved lifting and bending.  (*Id.*)

On May 2, 2019, Goode underwent an EMG of his right upper extremity.  (*Id.* at 456.)  The EMG results revealed "electrodiagnostic evidence of right ulnar neuropathy at the elbow, sensorimotor, with a conduction velocity drop across the elbow," although the proximal ulnar muscle sampling was limited by Goode's tolerance.  (*Id.*)  The EMG revealed no evidence of neuropathy or radiculopathy.  (*Id.*)

On May 21, 2019, Goode saw Kathryn Wozniak, PA-C, for complaints of right small and ring finger numbness for the past six to eight months.  (*Id.* at 463.)  Goode described the numbness as constant and said it was worse at night or with activity.  (*Id.*)  Goode reported he also had had this problem on the left side, "but it resolved spontaneously."  (*Id.*)  On examination, Wozniak found no deformities or swelling, 4/5 grip strength, no subluxation of the ulnar nerve with elbow flexion, and appropriate response of the median, radial, and ulnar nerves.  (*Id.*)  Wozniak discussed treatment options, including an elbow sleeve, Gabapentin, and surgery, with Goode.  (*Id.* at 464.)  Goode stated he would like to try 300 mg of Gabapentin at night.  (*Id.*)

On July 22, 2019, Goode saw Dr. Raju for follow up.  (*Id.* at 472.)  Goode complained of increased use of albuterol recently and occasional chest pain on the left when taking a deep breath.  (*Id.*)

Dr. Raju noted a November 2018 chest CT revealed no nodules and an April 2019 stress test was normal. (*Id.*)  Goode reported Gabapentin was not working well for his neuropathy; it just made him tired.  (*Id.*)  Goode also complained of numbness of his left thumb for the past month and neck pain that radiated to his left hand.  (*Id.*)  Goode denied numbness and tingling in his hands and feet, as well as chest pain and shortness of breath.  (*Id.*)  On examination, Dr. Raju found lungs clear to auscultation without wheezes, rales, or rhonchi, no pretibial edema, and a normal foot exam.  (*Id.*)  Dr. Raju ordered a chest x-ray and physical therapy.  (*Id.* at 474.)  Dr. Raju recommended Goode follow up with orthopedics regarding surgical options for his hand.  (*Id.*)

On July 30, 2019, Goode saw PA-C Wozniak for follow-up of his bilateral arm pain.  (*Id.* at 484.)  Goode reported no change in his right arm nerve symptoms; Gabapentin just made him sleepy.  (*Id.*)  Goode also complained of new left arm pain that seemed to radiate from his neck down to his thumb.  (*Id.*)  He had not taken anything for his left arm pain.  (*Id.*)  On examination, Wozniak found positive Spurling maneuver on the left along the C6 nerve distribution, minimal subluxation of the ulnar nerve with elbow flexion, 5/5 grip strength bilaterally, and appropriate response of the median, radial, and ulnar nerves.  (*Id.*)  X-rays taken that day revealed "significant degenerative changes along the C-spine including advanced C2-C7 endplate spondylosis and hypertrophic degenerative arthrosis of the multiple facet joints."  (*Id.*)  Wozniak prescribed prednisone for Goode's neck pain and ordered an MRI of Mr. Goode's cervical spine.  (*Id.* at 484-85.)

An August 16, 2019 MRI revealed "spondylosis resulting in severe spinal canal narrowing and mild to moderate cord flattening at the C2-3, C3-4 and C4-5 levels," as well as "[a]dditional moderate C5-6 spinal canal stenosis."  (*Id.* at 494.)

On September 10, 2019, Goode saw Michael Kelly, M.D., for a spine consultation.  (*Id.* at 506.)  Goode complained of bilateral hand clumsiness and weakness (right worse than left) over the past few years that had worsened in the past few months.  (*Id.*)  Goode reported dropping things and numbness in his arms and hands.  (*Id.*)  Goode denied gait imbalance or falls, although he reported chronic neck pain that was not severe.  (*Id.*)  On examination, Dr. Kelly found 5/5 muscle strength, 4/5 grip strength, normal gait, normal reflexes, and no Hoffman's sign.  (*Id.* at 508-09.)  Dr. Kelly discussed treatment options,

including observation and therapy, with Goode.  (*Id.* at 509.)  Dr. Kelly offered Goode surgery, and Goode stated he wanted to think about his options and talk it over with his family.  (*Id.*)

On October 21, 2019, Goode saw Dr. Raju for follow up.  (*Id.* at 523.)  Goode reported that he was experiencing shortness of breath recently and had noticed better improvement when he used a relative's Atrovent inhaler.  (*Id.*)  Goode complained of occasional numbness and tingling in his hands and feet but denied chest pain and shortness of breath.  (*Id.*)  On examination, Dr. Raju found bilateral air entry and a few wheezes, no pretibial edema, and normal foot exam.  (*Id.*)

On October 24, 2019, Goode saw Ishan Lalani, M.D., MPH, for management of his COPD.  (*Id.* at 532.)  Goode reported feeling better that day but complained of occasional shortness of breath that came and went on its own.  (*Id.*)  Dr. Lalani noted exertional dyspnea from a stress test in April.  (*Id.*)  Goode also reported occasional cough that was more than usual lately, wheezing, dyspnea, an exercise capacity of a half a mile but sometimes felt really short of breath after just one flight of stairs, orthopnea, and lower extremity edema.  (*Id.*)  Dr. Lalani noted Goode did not use supplemental oxygen.  (*Id.*)  Treatment notes reflect Goode worked in an automotive repair shop as a mechanic and was exposed to fumes, smoke, dust, and chemical aerosol.  (*Id.* at 533.)  Dr. Lalani found 54% predicted FEV1 post-bronchodilator and noted no exacerbations in the past year.  (*Id.*)  On examination, Dr. Lalani found no cardiovascular symptoms and no arthritic pain, joint swelling, or muscle weakness, no lower extremity edema, good air entry with symmetric breath sounds, and no wheezing, cracking, or rhonchi.  (*Id.* at 534, 537-38.)  Dr. Lalani diagnosed Goode with severe COPD GOLD B2 and subcentimeter pulmonary nodule, decreased in size.  (*Id.* at 539.)  Dr. Lalani recommended pulmonary rehab.  (*Id.*)

On November 5, 2019, Goode saw Dr. Kelly for follow up after having declined surgery in September 2019.  (*Id.* at 547.)  Goode denied any changes since his last visit, including any new weakness or clumsiness.  (*Id.*)  Goode wanted to discuss surgical options again.  (*Id.*)  On examination, Dr. Kelly found 5/5 muscle strength.  (*Id.*)  Dr. Kelly again offered Goode spinal surgery.  (*Id.* at 548.)  Goode was "open to surgery but need[ed] to arrange some personal matters ahead of time" and would return in six weeks to discuss surgical planning.  (*Id.*)

On December 3, 2019, Goode saw James Anderson, M.D., for a second opinion regarding his neck

8

pain. (*Id.* at 561.) Dr. Anderson noted Goode's recent MRI revealed "severe cervical canal stenosis from C2-3 to C5-6" and that Goode had "signs and symptoms of cervical myelopathy." (*Id.*) Dr. Anderson reassured Goode regarding Dr. Kelly and told Goode he would recommend decompressive cervical laminectomy from C2-3 to C6, as well as a posterior instrumented fusion. (*Id.*) Dr. Anderson told Goode he fell into the absolute indications for surgery as opposed to the relative indications for surgery, which was why Dr. Kelly recommended surgery at the first visit. (*Id.*)

**C.      State Agency Reports**

On January 22, 2019, Kalpna Desai, M.D., opined Goode could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. (*Id.* at 133-34.) Goode could frequently push and/or pull with his bilateral upper extremities. (*Id.* at 133.) Dr. Desai further opined Goode could frequently climb ramps/stairs, but could never climb ladders, ropes, or scaffolds. (*Id.*) Goode's ability to balance was unlimited, and he could frequently stoop, kneel, crouch, and crawl. (*Id.*) Dr. Desai further opined Goode must avoid concentrated exposure to extreme heat, extreme cold, humidity, fumes/odors/dusts/gases/poor ventilation, and hazards. (*Id.* at 134.)

On March 8, 2019, on reconsideration, Leon Hughes, M.D., affirmed Dr. Desai's findings. (*Id.* at 147-48.)

**D.      Hearing Testimony**

During the December 11, 2019 hearing, Goode testified to the following:

- He is unable to work because he cannot lift too much weight and he has severe pains in his arms, neck, and back. (*Id.* at 53-54.) He cannot lift more than 10 pounds because of "clumsiness" in his hands. (*Id.* at 54.) If he has too much weight, his hands get weak, and he will drop it. (*Id.*) He has constant numbness and tingling in his fingers up to his elbows. (*Id.*) If he is sitting straight up in a chair, he gets shooting pains down his back and he has to shift from side to side. (*Id.*) The only thing that helps is lying down and contorting his body. (*Id.* at 55.)

9

- He takes pain medication and Gabapentin.  (*Id.*)  He also takes aspirin.  (*Id.*)
  Prednisone helps, but he only gets a one week burst of that; his doctors do not
  prescribe that regularly.  (*Id.*)

- He needs spinal surgery in his neck to prevent further damage and worsening of the
  condition.  (*Id.* at 55-56.)  He has not scheduled surgery yet because he knew he had
  this hearing scheduled.  (*Id.* at 56.)  He plans to undergo surgery at the beginning of
  the year.  (*Id.*)

- He can stand for maybe an hour or so.  (*Id.*)  He can walk for a little bit, but then his
  legs and feet start to hurt and ache, so he needs to sit down.  (*Id.*)  He could walk
  maybe a half a block to a block.  (*Id.* at 57.)  When he gets short of breath, he uses his
  inhaler, and he stops walking.  (*Id.*)  He also takes a few minutes' break.  (*Id.*)  He
  could not be on his feet for four hours or six hours over the course of an eight-hour
  workday, although he may be able to be on his feet for two hours over the course of
  an eight-hour workday.  (*Id.* at 58.)

- He has difficulty with his breathing.  (*Id.* at 56.)  He has a machine, as well as
  inhalers, but sometimes just walking he will get shortness of breath from time to
  time.  (*Id.* at 56-57.)  He uses his breathing machine twice a week.  (*Id.* at 57.)

- He has problems grabbing smaller objects.  (*Id.* at 58.)  He can wash dishes, but they
  only take 30 seconds because he does not have many to do.  (*Id.*)  He cleans the
  house and does laundry, but it takes a while for him to do because he sits down and
  rests.  (*Id.* at 59.)  He needs to take breaks because he gets winded and then he hurts
  and cannot stand for a long time.  (*Id.*)  He can do chores for 10 to 15 minutes before
  needing a break.  (*Id.*)  His hands tighten up or cramp up when vacuuming so he will
  have to stop.  (*Id.*)

The ALJ informed the VE that Goode had past relevant work as a laborer and a cleaner.  (*Id.* at

50.)  The ALJ then posed the following hypothetical question:

> Mr. Wright, assume an individual who can engage in light exertion; who can
> frequently push/pull bilaterally with the upper extremities; who should never
> climb, [sic] ladders, ropes, or scaffolds; can frequently climb ramps and stairs;
> frequently stoop, kneel, crouch, and crawl; should avoid concentrated exposure to
> extreme cold, heat, humidity, and respiratory irritants; should avoid hazards such
> as working in unprotected heights, and operating dangerous moving machinery
> such as power saws and jackhammers.  As you review this hypothetical
> individual, could this individual perform any of the claimant's past relevant work?

(*Id.* at 60.)

10

The VE testified the hypothetical individual would not be able to perform Goode's past work as a laborer and cleaner.  (*Id.*)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as marker, garment sorter, and checker.  (*Id.* at 61.)

The ALJ modified the hypothetical to add a limitation to frequent overhead reaching bilaterally. (*Id.* at 62.)  The VE testified the jobs he identified would remain at the same numbers.  (*Id.* at 63.)

Counsel for Goode asked the VE whether changing the hypothetical to add the limitations of grasping 50% of the time and fingering 25% of the time would affect his answers.  (*Id.*)  The VE testified the positions he identified would be eliminated.  (*Id.* at 64.)  Counsel asked the VE whether there would be other light jobs.  (*Id.*)  The VE testified the hypothetical individual could perform the positions of counter clerk, furniture rental assistant, and mill stenciler.  (*Id.*)

### III.      STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. § 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. § 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. § 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or

11

medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. § 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. § 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since November 13, 2018, the application date (20 CFR 416.971 *et seq.*).

2.    The claimant has the following severe impairments: degenerative joint disease of the left elbow; right ulnar neuropathy at elbow; minimal degenerative changes of the lumbar spine; chronic obstructive pulmonary disease; and degenerative disc disease of the cervical spine (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant can frequently push and pull bilaterally with the upper extremities; can never climb ladders, ropes, or scaffolds; can frequently climb ramps and stairs; can frequently stoop, kneel, crouch, and crawl; must avoid concentrated exposure to extreme cold, extreme heat, humidity, and respiratory irritants; and must avoid hazards such as working in unprotected heights and operating dangerous moving machinery such as power saws and jackhammers.

5.    The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.    The claimant was born on November **, 1968 and was 50 years old, which is defined as a younger individual age 45-49, on the date the application was filed. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 416.963).

7.     The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.     Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).

9.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.    The claimant has not been under a disability, as defined in the Social Security Act, since November 13, 2018, the date the application was filed (20 CFR 416.920(g)).

(Tr. 25-35.)

## V.     STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different

conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

14

## VI. ANALYSIS

Goode raises the following issue on appeal: "Whether the ALJ's decision is supported by substantial evidence when the ALJ failed to adequately evaluate the limitations resulting from [Goode's] severe impairments."  (Doc. No. 17 at 11.)  Under this broad assertion, Goode asserts the following assignments of error: (1) the ALJ erred in her subjective symptom analysis and (2) the ALJ erred in evaluating the medical opinion evidence of record.  (*Id.* at 11-15.)

### A.      Subjective Symptom Analysis

Goode argues his testimony regarding his limitations in his upper extremities and his respiratory problems are supported by objective evidence in the record, including:

- A 2014 EMG of his bilateral arms.

- A 2019 EMG of his right arm.

- A 2019 MRI of his cervical spine.

- Recommendations by two orthopedic surgeons that he undergo cervical spine surgery.

- A 2016 pulmonary function study.

- A 2018 pulmonary function study.

- Dr. Raju's treating source opinion.

(*Id.* at 12-13.)  Goode asserts the ALJ "engaged in a deficient analysis of the evidence" to reach her conclusions, specifically:

- The ALJ failed to acknowledge Dr. Faust's statement that the work Goode did was inconsistent, and moreover, this level of work activity did not demonstrate the RFC to perform light work full-time on a continuous basis.

- The ALJ failed to question Goode on a notation in the file that he worked as a mechanic.

- The ALJ failed to acknowledge a notation in the medical record that Goode stated he could walk half a mile at times, but at other times he felt short of breath with just one flight of stairs.

15

- The ALJ relied upon a physical therapy note that Goode put forth questionable effort during strength training, but the physical therapy involved treatment for his low back pain and was from a physical therapist who was not an "acceptable medical source."

- The ALJ "inaccurately report[ed]" that ulnar neuropathy was in Goode's non-dominant hand, when a 2014 EMG showed bilateral ulnar neuropathy in both elbows.

(*Id.* at 14.)

The Commissioner responds that the ALJ "properly analyzed" Goode's activities and subjective complaints.  (Doc. No. 18 at 4.)  The ALJ "repeatedly noted" Goode performed odd jobs, "which indicated that it was not a consistent work schedule or regular job," the ALJ was not required to "repeat Dr. Faust's notes verbatim," and the ALJ did not err in failing to quote a particular sentence from Dr. Faust's report. (*Id.* at 5.)  In addition, the ALJ never suggested the ability to perform odd jobs equated to the ability to perform light work full-time; however, the regulations require the ALJ to consider a claimant's daily activities.  (*Id.*) (citing 20 C.F.R. § 416.929(c)(3)(i)).

The Commissioner further argues Goode waived his argument that the ALJ failed to question him about his work as a mechanic, as he fails to identify any authority showing the ALJ was required to do so. (*Id.* at 6.)  Moreover, the ALJ was allowed to consider this evidence.  (*Id.*)  In addition, the ALJ acknowledged Goode's complaints of shortness of breath while walking.  (*Id.*)

The Commissioner asserts that Goode's argument that the physical therapist was not an "acceptable medical source" is a red herring, as "[w]hether a treatment provider is an acceptable medical source is relevant to whether the source can 'establish the existence of an impairment,' which is not an issue in this case."  (*Id.*)

Finally, the Commissioner argues the ALJ properly considered the objective evidence in the record, including the 2019 EMG.  (*Id.* at 7-8.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 416.945(a)(1).  A claimant's RFC is not a medical opinion, but an administrative

determination reserved to the Commissioner.  *See* 20 C.F.R. § 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R. § 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. § 416.946(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered*.  See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*).  However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to

17

acknowledge evidence that potentially supports a finding of disability.  *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").  *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms.  *See e.g., Massey v. Comm'r of Soc. Sec.*, 409 F. App'x 917, 921 (6th Cir. 2011).  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms.  Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work."  20 C.F.R. § 404.1529(c)(1).  *See also* SSR 16-3p,[3] 2016 WL 1119029 (March 16, 2016).

---

[3] SSR 16-3p superseded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016.  Thus, SSR 16-3 was in effect at the time of the December 11, 2019 hearing.

If these claims are not substantiated by the medical record, the ALJ must make a credibility[4] determination of the individual's statements based on the entire case record. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ"). The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2016 WL 1119029; *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. *See* 20 C.F.R. § 404.1529; SSR 16-3p, 2016 WL 1119029 (March 16, 2016). Beyond medical evidence, there are seven factors that the ALJ should consider.[5] The ALJ need not analyze all seven factors but should show that he considered the relevant

---

[4] SSR 16-3p has removed the term "credibility" from the analysis. Rather, SSR 16-3p directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms," and "evaluate whether the statements are consistent with objective medical evidence and other evidence." SSR 16-3p, 2016 WL 1119029, at *6. The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016).

[5] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and

evidence.  *See Cross*, 373 F. Supp. 2d at 733; *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ acknowledged Goode's testimony and other statements regarding his symptoms and limitations.  (Tr. 29-30)  The ALJ determined Goode's medically determinable impairments could reasonably be expected to cause the alleged symptoms.  (*Id.* at 30.)  However, the ALJ found his statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with medical evidence and other evidence in the record for the reasons set forth in the decision. (*Id.*)  Specifically, after reviewing the relevant medical evidence, the ALJ found:

> As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent because the objective medical record does not support the alleged level of limitation.
>
> First, at the claimant's consultative psychological examination, the claimant indicated that he performed "odd" jobs such as cutting grass or shoveling snow for an hour a day, five days a week (Exhibit B5F). The claimant reported going grocery shopping two times a month. The claimant indicated that he could do household chores and cooking until he experienced fatigue or joint pain. Additionally, other notes state that the claimant works as a mechanic with exposure to fumes, smoke, dust, and chemical aerosol (Exhibit B9F, page 21).
>
> The claimant underwent a physical examination on November 20, 2018, with Nygi Raju, M.D. (Exhibit B2F, page 5). The examination noted that spirometry from July 11, 2016, showed significant improvement of a severe obstructive ventilatory defect with bronchodilator therapy. An examination of the lungs showed good breath sound with no wheezes, rales, or rhonchi. Examination notes were generally unremarkable. The claimant underwent pulmonary function testing again on December 4, 2018 (Exhibit B6F, page 15). Testing again was consistent with a severe obstructive ventilatory defect with a significant response to inhaled bronchodilators with air trapping and normal diffusing capacity. The provider believed the findings were consistent with asthma. Treatment notes from April 8, 2019, showed gait within normal limits (Exhibit B8F, page 5).
>
> Physical therapy notes from April 18, 2019, for chronic back pain showed the claimant had questionable effort on muscle strength testing (Exhibit B8F, page

---

restrictions due to pain or other symptoms.  *See* SSR 16-3p, 2016 WL 1119029, at *7; *see also Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

20). Despite this, the claimant had five-out-of-five or four-out-of-five strength in all areas tested. The claimant had reduced range of motion in the trunk and hip. This included moderate loss of trunk extension and moderate loss on the left of side bending. The claimant's hip extension and flexion was zero out of 90 degrees.

The claimant reported symptoms of numbness in the right ring and little finger on April 16, 2019, to Nygi Raju, M.D. (Exhibit B8F, page 14). Dr. Raju's notes indicated that the claimant denied numbness and tingling in the hands and feet and shortness or [sic] breath. The claimant's extremities had no pretibial edema.

The claimant underwent an EMG on May 2, 2019 (Exhibit B8F, page 28). Results showed evidence of right ulnar neuropathy at the elbow sensorimotor with a conduction velocity drop across the elbow. However, the proximal ulnar muscle sampling on EMG was limited by patient tolerance. There was no electro-diagnostic evidence of right median neuropathy or C5-T1 radiculopathy.

Treatment notes from May 21, 2019, indicated that the claimant reported a six-to-eight month history of right small finger and ring finger numbness (Exhibit B8F, page 35). The claimant had no swelling but four-out-of-five grip strength. Capillary refill was less than two seconds. There was no subluxation of the ulnar nerve with elbow flexion. The medial, radial, and ulnar nerves responded appropriately.

The claimant presented to Dr. Raju on July 22, 2019 (Exhibit B8F, page 44). Dr. Raju's examination did not note any abnormalities.

Imaging of the cervical spine dated July 22, 2017, showed "mild" multilevel degenerative disc disease and advanced C2-C7 endplate spondylosis and hypertrophic degenerative arthrosis of multiple facet and uncovertebral joints with apparent moderate to marked C3-4 osseous neuroforaminal stenosis.

The claimant had five-out-of-five grip strength on July 30, 2019 (Exhibit B8F, page 56). The claimant had a positive Spurling maneuver.

The claimant underwent an MRI of the cervical spine on August 16, 2019 (Exhibit B8F, page 66). This indicated that the claimant had spondylosis resulting in severe spinal canal narrowing and mild-to-moderate cord flattening at the C2-3, C3-4, and C4-6 levels. There was no cord signal abnormality. At C5-6, the claimant had moderate spinal canal stenosis. There was multilevel foraminal stenois [sic] most pronounced at the right with severe narrowing at C3-4.

The claimant presented for a neuroscience consultation on September 10, 2019 (Exhibit B8F, page 78). The claimant denied gait imbalance or falls but reported non-severe neck pain and hand clumsiness and weakness. The claimant had normal gait. Upper muscle strength was normal except for four-out-of-five grip strength. The claimant was offered surgical intervention but indicated that he wanted time to think about his options.

>The claimant presented to Dr. Raju on October 21, 2019 (Exhibit B9F, page 9). The claimant reported occasional numbness in the hands and feet. Pulmonary testing again was consistent with a severe obstructive ventillatory [sic] defect that had significant response to bronchodilators. Dr. Raju believed that this was consistent with asthma.
>
>The claimant presented to a pulmonary specialist on October 24, 2019 (Exhibit B9F, page 20). The claimant indicated that he was feeling better. Notes state that the claimant occasionally had shortness of breath spells that come and go on their own. Examination notes were unremarkable. Notes state that the claimant had no significant oxygen desaturations when walking at a normal pace, and no supplemental oxygen was needed for low-level daily activities.

(*Id.* at 30-32.)

The Court finds substantial evidence supports the ALJ's assessment of Goode's subjective complaints. The record evidence, as noted by the ALJ, is not entirely consistent with Goode's allegations of disabling conditions. (*Id.*) The ALJ considered evidence regarding several of the regulatory factors. (*Id.*) The ALJ's discussion of the relevant medical evidence included several findings that undercut a finding of disability, including full or only slightly reduced upper extremity strength, full grip strength in July 2019 and 4/5 grip strength in September 2019, and significant response to bronchodilators in pulmonary testing. (*Id.*) In addition, during the hearing, the ALJ explained the basis of the hypothetical posed to the VE as follows:

>I'm not going to put any limitations on the use of the hands because his grip strength is still four out of five; that is within normal limits and acceptable functional limits – certainly not enough to support a reduction down to 50 percent, as a treating source said, or even – worse yet, 25 percent. And then, also because he is left-hand dominant and all of these are in the left hand. He has no radiculopathy. Radiculopathy would be the one neurologic impairment that would affect weight, and we don't see evidence of that. But I will limit him to frequent overhead reaching bilaterally as a restriction in hypothetical number two.

(*Id.* at 62-63.)

Goode points to no contrary lines of evidence the ALJ ignored or overlooked. Although Goode argues the ALJ "inaccurately reports that the ulnar neuropathy is in [his] non-dominant hand" because of a 2014 EMG, the 2014 EMG significantly predates the 2018 alleged onset date and Goode reported in 2019

22

that the symptoms in his left arm had resolved "spontaneously." (*Id.* at 463.)  While Goode takes issue with the ALJ's interpretation of certain evidence and would have weighed the evidence differently, it is not for the Court to weigh the evidence or resolve conflicts in the evidence.  Suffice it to say, the ALJ acknowledged findings both supporting and detracting from a determination of disability and weighed the evidence accordingly.  Moreover, with respect to the notation by the physical therapist that Goode put in questionable effort on muscle testing, the Commissioner's argument is well-taken that whether the physical therapist was an acceptable medical source has no bearing on the ALJ's ability to consider the evidence regarding Goode's effort (or lack thereof) in her RFC and subjective symptom analysis.

The ALJ referenced Goode's allegations and then contrasted them with the medical evidence, including examination findings, as well as the opinion evidence (discussed in further detail *infra*).  (*Id.* at 29-32.)  Reading the decision as a whole, it is clear why the ALJ did not accept the entirety of Goode's allegations.  *See* SSR 16-3p, 2016 WL 1119029 (the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.").  The Court is able to trace the path of the ALJ's reasoning regarding the ALJ's subjective symptom analysis.  Therefore, the Court find no error in the ALJ's subjective symptom analysis.

Although Goode cites evidence from the record he believes supports a more restrictive RFC, the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion."  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001).  Indeed, the Sixth Circuit has made clear that an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469,

477 (6th Cir. 2003). The ALJ clearly articulated her reasons for finding Goode capable of performing work as set forth in the RFC and these reasons are supported by substantial evidence. There is no error.

## B.  Opinion Evidence

Goode argues the ALJ "unreasonably" found Dr. Raju's opinion not persuasive by finding Goode had a "good response" to bronchodilators when treatment records showed that even with a "'significant'" response to bronchodilators, he still experienced "moderate breathing difficulties." (Doc. No. 17 at 15.) In addition, Goode argues Dr. Raju's opinion regarding his lifting restrictions and limitations on the use of his upper extremities is supported by the EMG and MRI studies, and the ALJ failed to take this evidence into account in determining the persuasiveness of Dr. Raju's opinion. (*Id.*)  In addition, Goode argues the ALJ "inconsistently" found the opinions of the state agency reviewing physicians persuasive when their opinions were based on an incomplete record, even though the ALJ found consulting examiner Dr. Bradford's opinion deficient for failing to consider Goode's "severe obstructive respiratory function" and Goode's more recent MRI. (*Id.*)  Finally, Goode argues the ALJ failed to consider Dr. Anderson's "opinion" that Goode suffered from "severe cervical canal stenosis from C2/3 to C5/6 with signs and symptoms of cervical myelopathy." (*Id.*)

The Commissioner responds the ALJ "appropriately" found Dr. Raju's opinion unpersuasive, as it was a "checkbox" opinion and "'did not cite any clinical findings other than indicating the claimant did not have swelling.'" (Doc. No. 18 at 8.)  As Dr. Raju did not cite MRI or EMG evidence in support of his opinion, Goode's argument constitutes impermissible *post-hoc* support of the opinion. (*Id.* at 9.)  In addition, the ALJ identified evidence that was inconsistent with Dr. Raju's opinion. (*Id.* at 9-10.)  The Commissioner accuses Goode of "nitpicking" the ALJ's analysis, and even if Goode had a "significant response" instead of a "good response" to bronchodilators, Goode admits he "only had moderate breathing difficulties . . . not severe difficulties." (*Id.* at 10) (footnote omitted).  In addition, even if the ALJ erred in

24

that inconsistency, the ALJ identified several other inconsistencies and so any such error would not necessitate remand.  (*Id.*)

The Commissioner further argues the ALJ appropriately weighed the opinions of Dr. Bradford and the state agency reviewing physicians.  (*Id.* at 11.)  The Commissioner asserts that, contrary to Goode's assertion, the ALJ did not fault Dr. Bradford's opinion for not having access to later MRI evidence; rather, the ALJ faulted her opinion for its failure to acknowledge Goode's degenerative changes and breathing problems.  (*Id.*)  In contrast, the state agency reviewing physicians acknowledged Goode's degenerative changes and accounted for his respiratory function.  (*Id.*)  Furthermore, the Commissioner emphasizes that this alleged inconsistency worked in Goode's favor, as Dr. Bradford's opinion was less restrictive than the ALJ's RFC.  (*Id.* at 12.)  The Commissioner argues that the ALJ considered evidence post-dating Dr. Bradford's and the state agency reviewing physicians' opinions, and thus could rely on them.  (*Id.*)

Finally, the Commissioner argues that Dr. Anderson's statement that Goode needed surgery was considered by the ALJ, but as this statement did not constitute a medical opinion under Social Security regulations, the ALJ was not required to explain her consideration of this statement in her opinion.  (*Id.* at 12-13.)

Since Goode's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 416.920c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources."  20 C.F.R. § 416.920c(a).  Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the

25

factors set forth in the regulations: (1) supportability;[6] (2) consistency;[7] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements.  20 C.F.R. § 416.920c(a), (c)(1)-(5).  However, supportability and consistency are the most important factors.  20 C.F.R. § 416.920c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions.  The new articulation requirements are as follows:

> (1)  Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.
>
> (2)  Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may,

---

[6] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(1).

[7] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(2).

but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

(3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 416.920c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. §§ 404.1520c(a), (b)(1); 416.920c(a), (b)(1)). A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

The ALJ found as follows regarding the opinion evidence of record:

Nygi Raju, M.D. completed a form questionnaire on the claimant's behalf on April 16, 2019 (Exhibit B7F, B11F). Dr. Raju indicated that the claimant had a good prognosis. Dr. Raju did not cite any clinical findings other than indicating the claimant did not have swelling at his most recent examination. Dr. Raju indicated that the claimant did not have any medication side effects. Dr. Raju opined that the claimant would have good and bad days and would miss four or more days of a work a month. Dr. Raju opined the claimant could walk one city block without requiring rest; sit for 30 minutes at a time; stand for 20 minutes at a time; sit for less than two hours of an eight-hour workday; stand and walk for less than two hours of an eight hour workday; and would require a job that permits shifting positions at will from sitting, standing, and walking. Next, Dr. Raju marked a box to indicate the claimant would require unscheduled work breaks. Dr. Raju explained that the claimant would experience flares in pain that would require him to rest for a full day. Dr. Raju indicated the claimant could occasionally lift less than ten pounds and would have postural limitations. Dr.

27

Raju wrote that the claimant could use his bilateral hands to grasp, turn, and twist objects for 50% of the workday and use his fingers for 25% of the workday. Next, Dr. Raju indicated that the claimant could bilaterally reach in front or overhead for 75% of the workday. Dr. Raju indicated that the claimant would have difficulty with an eight-hour schedule five days a week that involved lifting or bending.

The undersigned does not find this opinion persuasive. First, the statement is not internally supported. Dr. Raju did not reference any specific treatment notes, dates, or laboratory diagnostic testing results to support these extreme limitations. Moreover, the statements are vague and generic. These extreme limitations are contradicted by Dr. Raju's statement that the claimant had a good prognosis. Dr. Raju's notes, explored above, consistently showed the claimant had good response to bronchodilators. Next, the statements are not consistent with the record as a whole. As explored above, treatment notes show normal gait; normal sensation to light touch; five-out-of-five strength bilaterally in the arms; and only a slight (four out of five) reduction in grip strength. Physical therapy notes indicate that the claimant did not put forth full effort in muscle testing, and at least one note from the same time period shows five-out-of-five grip strength (7/30/2019, Exhibit B8F, page 56). At the consultative examination, the claimant's bilateral hands had normal grasp, manipulation, grasp, and fine coordination. At one point, the claimant denied arthritic pain and joint swelling (Exhibit 9F, page 22). Treatment notes from October 24, 2019, indicated that the claimant's grip and gait were normal, and an EMG did not show radiculopathy (Exhibit 9F, page 29). Whatever strength limitations the claimant has are accounted for by placing the claimant at the light exertional level. Finally, the opinions expressed in this opinion are contradicted by the exam findings of Dr. Dorothy Bradford addressed below.

The claimant underwent a consultative examination with Dorothy Bradford, M.D. on January 7, 2019 (Exhibit B4F). Imaging of the lumbar spine for the examination showed "minimal" arthritis and normal alignment. The claimant had a normal range of motion in all areas tested. This included the hands and fingers. Examination notes were generally unremarkable including no spinal tenderness and normal strength in all muscle groups. The claimant's hands bilaterally had normal grasp, manipulation, pinch, and fine coordination. Dr. Bradford wrote, "in my medical opinion, claimant has mild DJD [degenerative joint disease] of the lumbar spine without radiculopathy, flat feet and bunions. There are no activity restrictions." The undersigned finds these opinions persuasive to the extent they support that the claimant is not more limited than found above. The opinions are consistent with the generally unremarkable internal examination. However, they are not fully consistent with the record as a whole. Dr. Bradford did not address respiratory function. As explored above, the outside evidence shows that the claimant uses an inhaler in addition to severe obstructive respiratory function. The new evidence shows degenerative changes to the cervical spine. Therefore, the undersigned has found the claimant more limited.

Kalpna Desai, M.D., a State agency medical consultant, reviewed the claimant's case file on January 22, 2019 (Exhibit B6A). Dr. Desai determined that the claimant could perform at the light exertional level with frequent pushing and pulling in the upper extremities; frequent climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; frequent stooping, kneeling, crouching, and crawling; avoidance of concentrated exposure to extreme cold, extreme heat, humidity, atmospheric conditions; and workplace hazards. Dr. Desai attributed the claimant's exertional limitations to COPD and ulnar neuropathy. Dr. Desai indicated that the claimant could not climb ladders, ropes, or scaffolds due to neuropathy and back pain. Dr. Desai attributed the environmental restrictions to COPD with PFT and a severe obstructive ventilator defect with a significant response to inhaled bronchodilators with air trapping and normal diffusing capacity. Dr. Desai further cited findings from the record such as the claimant having a slightly obese BMI; strength within normal limits; and normal coordination skills. Dr. Desai indicated that due to new and material evidence, the prior ALJ findings were not adopted. Leon Hughes, M.D., a State agency medical consultant, reviewed the claimant's case file on March 8, 2019, and affirmed Dr. Desai's findings for the same reasons. The undersigned finds these opinions persuasive. The opinions are well supported internally for the reasons stated. These opinions continue to be consistent with the record as a whole.  The later record continued to show the claimant had significant response to bronchodilators. One record indicated that the claimant did not show oxygen desaturation with low-level activities (Exhibit B9F, page 26). The claimant continued to have a mildly obese BMI (e.g. Exhibit B9F, page 12). At times, the claimant had four-out-of-five grip strength, and an EMG showed ulnar neuropathy. However, this minor deviation in strength does not support greater limitations than placing the claimant at the light exertional level. As explored above, notes show the claimant works in an automobile repair shop. Moreover, at least one notes from this time period shows five-out-of-five grip strength (7/30/2019, Exhibit B8F, page 56). Physical therapy notes from April 18, 2019, show the claimant did not put forth "questionable effort" in strength testing (Exhibit B8F, page 20). The ulnar neuropathy is in the claimant's non-dominant hand. Similarly, the record shows cervical degenerative changes but does not show strength or gait deviations that support greater limitations than those found above.

(Tr. 32-34.)

Supportability and consistency are the most important factors under the new regulations for evaluating medical source opinions.  20 C.F.R. § 416.920c(a).  With respect to Dr. Raju's opinion, the ALJ found the opinion inconsistent with, and not supported by, medical evidence in the record, citing specific evidence in support.  (*Id.* at 32-34.)  As the ALJ noted, Dr. Raju's opinion lacked any reference to specific treatment notes, dates, or laboratory diagnostic testing to support the limitations set forth in the

29

opinion.  While Goode points to the MRI and EMG evidence in support, Dr. Raju did not do so.  *See Price v. Comm'r of Soc. Sec. Admin.*, 342 F. App'x 172, 176 (6th Cir. 2009) ("Because Dr. Ashbaugh failed to identify objective medical findings to support his opinion regarding Price's impairments, the ALJ did not err in discounting his opinion.") (citations omitted).  *See also Buxton*, 246 F.3d at 773 ("[T]he ALJ 'is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation.'") (citation omitted).  Moreover, the ALJ found the limitations in the opinion inconsistent with Dr. Raju's statement in the opinion that Goode's prognosis was good.  (Tr. 32.)   While Goode argues the ALJ erred in finding Goode had a "good response" to bronchodilators as opposed to a "significant response," the ALJ used the phrase "significant response" in discussing the treatment notes earlier in the opinion, the ALJ identified several other reasons to find Dr. Raju's opinion not persuasive, and the ALJ accounted for his COPD in the RFC.  (*Id.* at 29-30, 32-33.)

With respect to Dr. Bradford's opinion, the ALJ discounted her opinion in part as "not fully consistent with the record as a whole" since Dr. Bradford failed to address respiratory function and new evidence showed degenerative changes of the cervical spine.  (*Id.* at 33.)  As the ALJ found Goode more limited than Dr. Bradford, there is no error.

Nor is there any internal inconsistency between the ALJ's evaluation of Dr. Bradford's opinion and the ALJ's treatment of the state agency reviewing physicians' opinions, as the state agency reviewing physicians acknowledged Goode's COPD.  Furthermore, the ALJ considered the record evidence regarding cervical spine degenerative changes post-dating the state agency sources' review but found the record did not show strength or gait deviations warranting further limitations than those found in the RFC.  *Ealy*, 594 F.3d at 513-14 ("Even if Dr. Hernandez' RFC was completed without knowledge of these issues, however, the record reflects that the ALJ considered them."); *Minyard v. Berryhill*, No. 5:17CV2261, 2019 WL 1099552, at *5 (N.D. Ohio Mar. 8, 2019) ("Further, it is clear from the ALJ's

30

discussion of the evidence in the decision that it was known that medical evidence existed that post-dated the opinion evidence and that the ALJ considered the opinion evidence with that evidence in mind.").

Finally, Dr. Anderson's diagnosis of "severe cervical canal stenosis from C2-3 to C5-6" and his statement that Goode had "signs and symptoms of cervical myelopathy" do not constitute medical opinions as defined by Social Security regulations.  20 C.F.R. § 416.913(a)(2) ("A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the abilities listed in paragraphs (a)(2)(i)(A) through (D) and (a)(2)(ii)(A) through (F) of this section.")  In addition, the ALJ considered Goode's degenerative changes in his cervical spine in her RFC analysis.  (Tr. 31-34.)

It is the ALJ's job to weight the evidence and resolve conflicts, and she did so here.  While Goode would weigh the evidence differently, it is not for the Court to do so on appeal.

## VII.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

Date: December 15, 2021                    *s/ Jonathan Greenberg*
                                              Jonathan D. Greenberg
                                              United States Magistrate Judge